[Civ. No. 4772. Second Appellate District, Division Two.—January 30, 1925.]

## FIRST NATIONAL BANK OF SAN PEDRO et al., Petitioners, v. SUPERIOR COURT OF LOS ANGELES COUNTY et al., Respondents.

[1] PLEADING—EQUITABLE DEFENSES TO LEGAL ACTION—RIGHT TO JURY TRIAL.—When, in an action at law, equitable matters are set up in an answer, purely as a defense, that is, with no demand for affirmative relief the controversy is not thereby changed from an action at law to a suit in equity; but where the equitable matters alleged by the defendant are not merely defensive, but are matters of affirmative attack, the effect of which, if established, would extinguish plaintiff's cause of action, the issue taken thereon is triable by the court and not of right by a jury.

[2] ID.—NEW TRIAL—AMENDMENT OF PLEADINGS—VIOLATION OF REMITTITUR — MANDAMUS. — The facts that an action (which was originally one at law) was once tried, that on appeal the appellate court directed that a new trial be had on certain specific issues, that on the going down of the *remittitur* the trial court permitted the defendant to file an amended answer and cross-complaint presenting certain equitable matters of defense, thereby possibly violating the terms of the *remittitur,* and that the trial court is threatening to try the issues thus raised without a jury, contrary to plaintiff's demands, will not authorize the issuance of a writ of mandate to compel the trial court to limit the new trial to the scope contemplated by the *remittitur.*

[3] MANDAMUS—FUNCTIONS OF WRIT—RIGHT OF APPEAL.—While a writ of *mandamus* will lie to compel a subordinate judicial tri-

5.    See 16 Cal. Jur. 822.

bunal to proceed and exercise its functions when it has neglected or refused to do so, the writ cannot direct what decision or judgment shall be rendered; nor can it be granted, after the inferior tribunal has acted, for the purpose of reviewing its decision, where the right of appeal is adequate.

(1) 35 **C. J.**, p. 174, n. 13, p. 175, n. 16.   (2) 38 **C. J.**, p. 607, n. 55.   (3) 38 **C. J.**, p. 570, n. 72.

PROCEEDING in Mandamus to compel the Superior Court of Los Angeles County, and Walton J. Wood, Judge thereof, to proceed with the trial of an action before a jury. Peremptory writ denied.

The facts are stated in the opinion of the court.

Goodspeed & Pendell for Petitioners.

Fredericks & Hanna and K. A. Miller for Respondents.

WORKS, J.—There is pending in respondent court, before respondent judge, a certain cause entitled *First Nat. Bank of San Pedro* v. *Stansbury.* This cause will in this opinion be referred to as the action and the plaintiff therein will be referred to as the Bank. The trial of the action was commenced before a jury, the fees of the jury having been paid by the Bank, when, upon motion of Stansbury, respondent judge discharged the jury and appointed a referee to ascertain certain facts involved in the action and to make report thereof to the court. Thereupon the Bank and one John Balch, whose interest in the action will later appear, presented to this court their petition for a writ of mandate in the present proceeding. The petition prays that respondents be commanded to proceed with the trial of the action before a jury and to vacate the order of reference. An alternative writ issued and we are now to determine whether a peremptory writ shall go forth. The only question presented is as to the sufficiency of the petition for the writ, as the only return made by respondents is by demurrer.

The complaint in the action, composed of two counts, seeks to recover upon that number of promissory notes, each dated December 16, 1916, a cause of action upon the respective notes being alleged in the respective counts. The

pleading is in the ordinary form which is characteristic of complaints in such actions. It is alleged particularly, however, that Stansbury made and executed the notes to Balch and that the latter indorsed them to the Bank. Stansbury, after disposition was made of his original responses to the complaint in the action, filed an amended answer thereto and an amended cross-complaint. We proceed to state some of the allegations of these pleadings, omitting from each certain portions thereof which were eliminated upon demurrer thereto presented to respondent court. The amended answer denies that the note set up in the first count of the complaint was by Balch indorsed to the Bank. It is also denied that Stansbury owes the amount of the note or any part thereof, and denial is also made of the allegations of the complaint upon which the Bank asks for judgment for attorneys' fees for being compelled to sue upon the note. Denials similar to all of these are interposed as to the allegations of the complaint concerning the second note sued on. The amended answer also contains extensive statements of affirmative defense to the allegations of both counts of the complaint. It is alleged that some time prior to 1911 Balch and one Radich were partners in the cement contracting business; that, being financially involved and desiring to secure financial assistance, they made an arrangement with Stansbury whereby he was admitted into the partnership upon terms which were advantageous to all, Stansbury being particularly charged with the duty of collecting certain amounts due from various persons to Balch and Radich under their earlier operations; that, also, the new partnership was to carry on a business under new contracts similar to that formerly conducted by the original partnership; that the new, or three-way, partnership did thereafter complete work under certain new contracts; that an adjustment and settlement was made between them with the result that it was determined that Stansbury was indebted to Balch in a certain sum; that during 1911, or a short time prior to "the closing up of the aforesaid partnerships," Balch solicited Stansbury to join him in a new partnership without Radich for the purpose of conducting a more extensive business than that conducted by the three-way partnership; that pursuant to that solicitation Stansbury advanced money with which to make a settlement with Radich and entered

into a partnership with Balch alone; that this last-mentioned partnership completed many contracts aggregating in contract price about $200,000 or more; that Stansbury advanced various large sums of money with which to conduct the operations of the partnership existing between Balch and him; that Balch "kept the time book of labor and payroll of the partnership and purchased much material and many of the accounts were handled by him alone"; that at no time during the existence of the partnership was any accounting taken nor was there any settlement of the partnership affairs between Balch and Stansbury; that at all times during the existence of the partnership there were outstanding large amounts of indebtedness owing by the partnership and large amounts were due and owing to the partnership; "that all accounts as to the cost of the various contracts were largely kept by the said Balch"; that contracting jobs would often overlap each other and it was therefore difficult from time to time to strike a balance between the partners, or to make an accurate audit of the accounts of the partnership; and that on or about August 28, 1915, and during extensive existing operations of the partnership, Stansbury having insufficient accounts of its operations, Balch applied to Stansbury "and requested that they make an estimate of the state of their affairs." Various allegations then appear which tend to show the inability of Stansbury, on account of the lack of data in his hands, to arrive at a correct estimate of the partnership affairs, and the inability of both Balch and Stansbury, without the aid of accountants, to come to an understanding of their financial relations and situation. It is next alleged that "it was then agreed between said partners that any accounting then taken or statement made was to be regarded only as an estimate and tentative and not to be considered in any manner as accurate or definite, but solely and only as a general estimate of the profits or losses and of how the affairs of said partnership were progressing," and "that thereafter an accurate accounting would be taken of all of their business affairs by a proper accountant"; that upon that understanding "the said partners made a general statement of their estimated profits, which said estimate statement on said date showed a sum of $21,724.44," and was given by Balch to Stansbury, but was based upon insufficient and erroneous

data and was erroneously made, "was unreliable, freighted with gross errors, mistakes and miscalculations on each job, which tainted the entire account, all of which mistakes were mutual and were not known to the parties and not considered or taken into account in said statement"; that Balch thereafter fraudulently and in violation of the understanding between them sought to urge the statement thus made between them as final and conclusive, having secretly intended at the time of the making of the statement so to do. Specific facts are alleged which tend to exhibit the fraudulent intent of Balch in the respects just stated. It is then alleged that, pending an illness of Stansbury after the alleged "settlement," Balch represented to him that, in connection with certain uncompleted "jobs" under contracts held by the partnership, he, Balch, "could use said Stansbury's notes at" the Bank, "and that if said Stansbury would execute and deliver to him four promissory notes covering the balance of said estimated profits of August 28, 1915, . . . said tentative balance would be regarded as no different than as theretofore, but that he, said Balch, could secure money from the said bank . . . and use the said notes so to be executed by said Stansbury as collateral security therefor . . ."; and "that pursuant to said request it was agreed between the partners to, and said Stansbury did, execute said notes herein sued on, with the understanding and agreement at said time that said notes should not be treated in any manner different from said estimated statement, or in any manner to be asserted by said Balch against said Stansbury. . . . " Many and voluminous other allegations are contained in the amended answer, including an allegation that the notes sued on are held by the bank solely for the purpose of collection for the benefit of Balch, but it is unnecessary here to set them forth, as enough has been shown to exhibit the nature of the defense made by Stansbury to the complaint. The prayer of the amended answer is that the notes sued on be canceled; that an accounting be taken of the affairs of the partnership existing between Balch and Stansbury; that the partnership be terminated and settled and judgment be decreed for any indebtedness found due from one partner to the other; that Stansbury have his costs; and that he have any further relief to which he may be entitled. The matters alleged in the amended

answer are in substance repeated in the cross-complaint and the prayer of the latter pleading is in substance the same as that of the other.

Upon the showing of the record which is thus far disclosed there appears to be no question that the Bank was not entitled to a jury trial of the action. In its inception there is no doubt that the cause was a simple action at law upon promissory notes, the right to a jury trial if the controversy had maintained that form being equally undoubted. But observe the change in the situation, which arose upon the filing of Stansbury's amended pleadings. The litigation was then transmuted into a suit in equity for a partnership accounting and for the termination of the partnership relation. From that moment the controversy over the notes, launched by the filing of the complaint, became a mere incident in the larger controversy brought forward by the amended pleadings of Stansbury. Of that larger controversy the question of the very integrity of the notes became a part. The question whether the Bank, the mere agent of Balch in bringing the action, shall have judgment on the notes is swallowed by the broader question of accounting and partnership termination. The controversy as to the notes becomes but an item in the question of accounting. In thus stating the effect of the filing of Stansbury's amended pleadings we assume that it is proper practice for him to press the allegations presented in both the answer and the cross-complaint, for the petitioners make no point that it is not.

The estimate which we have placed upon the situation created by the filing of Stansbury's pleadings is well justified by the authorities. [1] It is possible that when, in an action at law, equitable matters are set up in an answer purely as a defense, that is, with no demand for affirmative relief, the controversy is not thereby changed from an action at law to a suit in equity (35 C. J. 174; and as bearing somewhat upon the *principle* announced, see *Lewis* v. *Tobias,* 10 Cal. 574; *Smith* v. *Sparrow,* 13 Cal. 596; *Shain* v. *Belvin,* 79 Cal. 262 [21 Pac. 747]). Where, however, the equitable matters alleged by the defendant are not merely defensive, but are matters of affirmative attack, the situation is quite different. It is said in a standard law publication that "if the answer contains not merely a technical defense but an

independent equitable cause of action constituting a cross-demand in favor of defendant, the effect of which, if established, would extinguish plaintiff's cause of action, the issue taken thereon is triable by the court and not of right by a jury" (35 C. J. 175). This rule, apparently prevailing everywhere, has found adequate expression in the opinions of our own courts. It was said in a cause in which a cross-complaint praying equitable relief had been interposed in opposition to a complaint at law: "Being an action cognizable in equity and distinct from the legal action, it was the duty of the court below to first determine the issues involved under the cross-complaint, for the reason that if the defendant succeeded on these issues it would defeat the right of plaintiffs to recover in their action at law, however perfect their legal right" (*Fish* v. *Benson*, 71 Cal. 428 [12 Pac. 454]; and see, also, *Swasey* v. *Adair*, 88 Cal. 179 [25 Pac. 1119]). We have no doubt that under the conditions thus far considered petitioners are not entitled to a jury trial of the action, except, perhaps, under the case last cited, in the event that the equitable relief prayed by Stansbury should be denied, the right to a jury trial thereafter may exist upon the few issues arising from the meager denials in the amended answer of allegations of the complaint. There is nothing in *Kearney* v. *Bell*, 160 Cal. 661 [117 Pac. 925], or in other cases relied upon by petitioners, which disturb our view upon the question.

[2] Are there other circumstances of the case which nullify the views above expressed? The action has been once tried and from the judgment entered pursuant to the trial an appeal was taken. The opinion rendered upon the appeal is to be found in the reported case, *First Nat. Bank* v. *Stansbury*, 62 Cal. App. 336 [217 Pac. 91]. Pursuant to this opinion a *remittitur* was sent down which reads, in part: "That a new trial be had of the issues presented with relation to credits claimed by respondent [Stansbury] by reason of errors or omissions in the settlement of the said partnership affairs [between Balch and Stansbury] whereby respondent claims the amount of said notes should be reduced." The amended pleadings filed by Stansbury, and which have been the subject of comment above, were filed, by leave of respondent court, after the *remittitur* went down, and the trial which was lately in progress before a

jury and which it is the object of this proceeding to cause to be completed was the new trial mentioned in the *remittitur.* It is the contention of petitioners that we may in the present proceeding limit the new trial to the scope contemplated by the *remittitur,* granting for the moment that the issues framed by Stansbury's amended pleadings are beyond the lines thus set. It is said that if the new trial were to proceed within the lines laid by the *remittitur* Stansbury could present no more than matter defensive to the complaint, that such matter could not change the aspect of the action as one at law, and that therefore the Bank is entitled to a jury trial. We cannot accede to these various views. The writ of mandate will issue only to compel "the performance of an act which the law specially enjoins, as a duty resulting from an office trust, or station" (Code Civ. Proc., sec. 1085). The law does not, within the contemplation of this provision, specially enjoin respondents to proceed with the trial of the action in conformity with the directions of the *remittitur,* granting again that its terms were violated by the permission given to Stansbury to file his amended pleadings and that a further violation is threatened by an attempt to try the issues raised by them. Upon these assumptions the steps already taken or which are threatened to be taken by respondents are but errors which respondents have jurisdiction to commit and which cannot be corrected by the writ of mandate. [3] In an action in which a trial court had denied a motion to enter a judgment of dismissal and in which it was sought to compel the court by the writ of mandate to enter such a judgment, it was said: "We do not think a *mandamus* will lie in this case. The real and substantial question presented for the decision of the Court by the motion to dismiss was whether the defendant had set up a counter claim against the plaintiffs upon which he was seeking affirmative relief. If he had not, the plaintiffs were undoubtedly entitled to the judgment which they asked, otherwise not. The solution of that question depended upon the judicial reading and construction of the defendant's answer and the stipulation between the parties, and the effect of the latter upon the former. It was claimed on the part of the plaintiffs, first, that the counter claim made in the answer could not be legally made in the action; and, second, that the counter claim had been

withdrawn by the force and effect of the stipulation. Both of these propositions were denied by the defendant, and in deciding them the judge acted judicially, not ministerially; and, having decided them according to the best of his ability, a *mandamus* does not lie to compel him to reverse his decision and render a different one. (*Chase* v. *Blackstone Canal Co.*, 10 Pick. (Mass.) 244; *People ex rel. Doughty* v. *Judges of Dutchess County*, 20 Wend. (N. Y.) 658.) This writ lies to compel a subordinate judicial tribunal to proceed and exercise its functions when it has neglected or refused to do so; but when the act to be done is judicial or discretionary the writ cannot direct what decision or judgment shall be rendered, nor can it be granted, after the inferior tribunal has acted, for the purpose of reviewing its decision. (*People* v. *Sexton*, 24 Cal. 79.) If the Court has committed an error in denying the plaintiffs' motion the same can be reviewed on appeal, which is a speedy and adequate remedy in the ordinary course of law within the meaning of the four hundred and sixty-eighth section of the Practice Act. To review errors is not the office of the writ of *mandamus"* (*People* v. *Pratt*, 28 Cal. 166 [87 Am. Dec. 110]). In view of the portion of this language relating to the adequacy of the remedy by appeal, it may be remarked that it is possible that in the strict sense the remedy of petitioners here by appeal is inadequate. It is, however, adequate in the sense that it is the only remedy allowable, and it is plain that it was in that sense that the language concerning the right of appeal in the cited opinion was used. Surely, the court there says that in such a case as the one with which it dealt there is no remedy by mandate, and the case exactly fits the present proceeding. The rule of *People* v. *Pratt, supra,* has been carried into other cases, the latest of which, apparently, is *Ewell* v. *Superior Court*, 69 Cal. App. 629 [232 Pac. 153].

The alternative writ of mandate is vacated and a peremptory writ is denied.

Finlayson, P. J., and Craig, J., concurred.